Good morning. May it please the Court. My name is Aguela Repes and I represent the Appellant, National Union Fire Insurance Company of Pittsburgh, PA. The resolution of this insurance coverage dispute is actually remarkably straightforward. It involves the basic question of, does the loss for which the Port seeks coverage here fall within the basic scope of coverage of the umbrella excess policies? The type of loss for the Port seeks coverage here is for pre-suit claims, for expenses related to responding to administrative agency orders related to cleanup and remediation of environmental contamination and pollution. So when one compares the loss to the language of the insuring agreement, and here the language of the insuring agreement is clear, there is a duty to defend suits seeking damages and there is a duty to indemnify damages. I understand that, Counsel, but I think your opposition suggests that endorsement 2 does not retain a subject to clause and thinks there's some significance in that. Would you like to address that for us? Yes, Your Honor. So you're referring to the ultimate net loss limits of liability amended endorsement. Yes, endorsement 2. Yes, and what the Port is focusing on in that endorsement is language that says this policy shall continue, enforces underlying insurance in the event of exhaustion. So the Port is reading that language in order as a sort of follow-form language to say that once primary insurance is exhausted, therefore the excess umbrella policies somehow transform into the primary policies and afford coverage on the exact same basis. And that is simply not true. All that this language is saying here in this endorsement is that once primary insurance exhausts, then excess coverage will pick up where primary leaves off. But that is a huge leap to say, oh, and therefore, by the way, it does so on precisely the same terms or somehow incorporates the broader insuring agreement of the underlying primary policies. That is absolutely not true. Counsel, the district court was concerned about ambiguity in the policy. This endorsement does not contain subject to language, whereas the basic part of the insurance agreement does contain that subject to language. So you have at the very outset of the policy, it indicates that it's subject to the limits of liability, exclusions, conditions, so forth that's set forth in the policy. Then you get to the endorsement, and that language is missing. Isn't it sort of basic insurance law that endorsements are tailored to the specifics of the policy? The language that includes the subject to language, it's sort of more like boilerplate. So isn't it particularly important that the endorsement does not have that subject to language? It's not, actually, Your Honor. This is the reason why. It's because the court is trying to construe this as somehow the endorsement eliminates the language of the policy form, and it doesn't. There's no absolute repugnancy. We know this from the Aerojet decision, which says only in the instances of absolute repugnancy does the endorsement control over the policy form. Here, there's no absolute repugnancy. That's correct. The subject to language that you're referring to is not in the endorsement. However, it still says this policy, meaning the umbrella excess policies. And by definition, this policy means subject to the terms and conditions of this policy. It doesn't refer to the underlying primary policies. It doesn't say we incorporate in terms and conditions of another policy. That's not what it says. It's substantively identical. This policy is substantively identical to this policy subject to its terms and conditions. That's inherent in the meaning of this policy. And I'd also like to point out that the ultimate net loss endorsement does not actually say it deletes anything in the policy form. It says it amends the policy form. And as the court agrees, it simply supplements the policy form. So, all these provisions can and should be read together. There is no repugnancy. So, there's nothing that's been deleted by virtue of the endorsement. Everything ought to be read together. Is there any other language in endorsement, too, that may be reasonably read as changing or altering the scope of the coverage? Endorsement, too, does not alter the scope of the coverage. The insuring agreement says what it says. It is limited to suits seeking damages, and the duty to indemnify is limited to damages. Nothing in this endorsement says that it is altering or broadening the scope of the coverage to include pre-suit claims. There's nothing in what it really is intended to do is to simply say that when underlying primary insurance exhausts, we'll pick up. So, that means that the excess coverage picks up and sits in the position and continues in force, but it doesn't say that we're going to do so on the same terms. And I'd like to point out that there's nothing incongruous about an excess policy that affords a narrower scope of coverage than the underlying primary policies. It depends on the language of the insuring agreement. It depends on what the policy says. So, some excess policies provide exactly a coextensive scope of coverage, and the way this is accomplished is either through a straight follow-form excess policy, or there could be an endorsement called a broad primary endorsement on the excess policy, and that ensures that the excess coverage is as broad and covers the same scope of risk as the underlying primary policy. But that's not invariably the case. You can also have excess policies that say they're follow-form, except to the extent that the excess policy provides additional terms, conditions, and exclusions. And in fact, that's often the case. Follow-form policies often narrow scope of coverage. So, you could do it that way, or you could do it the way we have it here in the umbrella excess policies, which is that those policies have their own insuring agreement that provide a narrower scope of coverage. Keep in mind, this is a standard form insuring agreement, at least for pre-1986 policies, which is what we're talking about here. This was a standard form insuring agreement. It didn't cover claims. It didn't cover expenses. It didn't cover costs outside the context of a lawsuit. And in fact, the primary policies have the identical standard form language, and the only reason that they provide a broader scope of coverage is because there's an endorsement. There's a broad form property damage liability insurance endorsement that expands coverage to we don't have that endorsement on the umbrella excess policies. What the port would like you to believe is that somehow this trigger of coverage language, by implication, should be read or could be read or might be read as follow-form language, and that's not the case. A follow-form policy is express. It says we expressly hereby adopt the terms and conditions of the underlying policy. It's a few pages long. It's meant to adopt another policy's insuring agreement. And if you want a good example of what an actual follow-form policy looks like, there is actually one in the record because there's one within the port's tower of coverage. Under the 8283 tower of coverage, there's a Lexington policy that says this is a follow-form excess liability policy. It expressly adopts the terms and conditions of the underlying policy. That's what an actual follow-form policy looks like. Now, Sebastian, the coverage provision, it does incorporate the definition of ultimate net loss. Ultimate net loss is defined. I mean, there are cases, Ninth Circuit cases, which have indicated that in order to understand the scope of coverage, you have to look at that ultimate net loss definition. And here, the ultimate net loss definition, it does make reference to claims, settlements of claims, and so forth. It doesn't. The district court looked at that and said, I believe that there is an ambiguity about the scope of coverage because of the way in which that coverage provision incorporates this definition of ultimate net loss. How do you respond to that? I'm sorry. We have a trio of cases from both from the California Supreme Court and from the California Court of Appeal that address precisely this issue. So, you have to look at it in context. It's not merely the fact that ultimate net loss includes the word claims. You have to look at its particular function and what it's doing. So, in Power Line 2, ultimate net loss appeared in the insuring agreement, and that insuring agreement says we cover damages and expenses. All is more fully defined by ultimate net loss. And the court there said, because that's a very broad insuring agreement, that ultimate net loss was meant to expand the scope of coverage beyond suits, and it also had that word expenses. We don't have that San Diego and also CDM investors. And CDM investors, which is directly on point, the ultimate net loss term was found in the insuring agreement. And the court said, well, you have to look at what it's doing, not just where it's located within the policy. It doesn't purport to expand the scope of coverage. It's simply identifying what amount the insurer will indemnify once the policy has been triggered. So, if there are expenses that have matured into damages, yeah, we'll pay those. We'll indemnify those. But that is not an independent expansion of the insuring agreement. That is not how ultimate net loss functions within the context of this particular insuring agreement, as was the case in CDM investors. Do I have to interpret this policy and find it to be clear and unambiguous in order to for you to win in this particular case? Well, it is clear and unambiguous. There is simply no other. I didn't ask you that. What if I find it isn't? I mean, there's no question it's challenging to lay person inexperienced in reading it might have a difficult time in doing it. Well, the standard is not simply, is it difficult for a lay person to piece together? The insuring agreement defines the basic scope of coverage. And that is clear. The report doesn't even really take issue with it because it says what it says. The fact is. I might just follow up to this question. I mean, this is on the aggregate limit of liability question. I mean, I'm looking at investment too. And you have that phrase separately in respect to products, liability and respect to personal injury by occupational disease sustained by any employees of the insured. Now, I mean, I would not call that artful drafting. It's a little so. It's a little hard to figure out exactly what that means. I mean, how do you? How would you? How do you? I mean, I know what you think ultimately it means, but can you put in plain terms what that what that phrase is? Sure. Sure. And we have the aid here of the California Court of Appeal decision in Garamendi, which considered exactly this language and the court. This while all this is doing is referring. If you look at the deck page item 3B, it says C or per endorsement to. So it's referring you to this endorsement to fill in additional details about what the limit is. So what is filling in here is the amount of the per occurrence limit. And it also says in the aggregate. So it's giving you the aggregate limit. That's the general aggregate limit. And then the language comma separately in respect of products, liability and occupational disease means there are also separate aggregate limits for these particular types of losses. So that doesn't eliminate the general aggregate limit. It adds to it. The 20 million dollar applies to those particular separate risks for product, product, personal injuries, result of product liability and occupational disease. Is that how it should be read? In addition, there are additional separate limits, but that doesn't negate the fact that there's also a general general aggregate limit in the same amount. And Garamendi construed the same language and reached the identical conclusion separately does not mean only it means in addition to not only. And I see that my time is running out. So with that, I will conclude with asking the court to reverse the judgment and enter judgment in favor of National Union in the manner that we requested in our opening brief. Thank you. All right. With that, given that Judge Rawlinson is again not on the video, but she's listening by telephone, let us go with the with the respondent or with the Pele plaintiff. Thank you, Your Honor. Robert Horkovich. On behalf of the San Diego Unified Court District, the key issue determines whether the San Diego Unified Court District gets the ability to tap its historic liability insurance coverage for its historic environmental liabilities imposed on the court, not because of its actions, but because of events that others took decades ago. AIG challenges two district court decisions in the court's favor regarding two aspects of AIG's obligations. One, the scope, and two, the amount. We respectfully ask this court to affirm the district court's in the umbrella or excess policies that alter the scope of coverage from suits and damages. Two things, Your Honor. First of all, in the record, an example on the insuring agreement in the record at 299, there's language that says this insuring agreement shall also apply to occurrences not covered by the underlying insurance due to exhaustion of any aggregate by the scope. That's in the preamble, right? That's in the preamble of the duty to defend. Now, just a minute, but doesn't that language just mean that this insuring agreement shall apply? That's the language. Just indicate that when excess coverage is triggered, it will be governed by this insurance agreement and therefore will be limited coverage for suits and damages. Your Honor has many duties and you're very, very busy, but one of the things, unfortunately, that AIG has put you in a position in here is being an underwriter for AIG. That's not what the policy says. The AIG underwriter... Well, I mean, I'm having a tough time understanding why it isn't what the policy says. Because it says, Your Honor, this insuring agreement shall also apply to occurrences. It says nothing about trigger. This shall also apply to occurrences not covered by the underlying insurance because of exhaustion of the aggregate limits by reason of loss pay they're under. So what it says is that when the underlying primary policy, which counsel for AIG readily concedes cover claims, where that underlying insurance is paid out and that insurance is no longer available, this insuring agreement applies to those occurrences. Now, then we move on. That's one. Then we move on to the endorsement two that you're referring to. We move on to the case... Counselor, before you go to the endorsement, I mean, just look at the coverage provision. Yes, sir. And look at the 2A under the defense provision. I mean, it seems to me that that language is very clear that the coverage here only relates to damages. And in fact, when the coverage provision refers to the portion of the... To the ultimate net loss provision, it's very careful to say that it's only that portion of the definition of ultimate net loss that relates to damages that is covered. And then in addition to that, and you can respond to both of these if you would please, the defense provision talks about they have an obligation, an obligation to defend any suit. But with respect to a claim, they have the right to, but they're not obligated to. So you look at those two provisions, seems to me they're all about damages and not at all about claims. Well, I hear what your honor is saying, but it does not say that in the provision saying that this applies to occurrences not covered by underlying insurance due to exhaustion. They don't put ultimate net loss in there. And then if I may proceed to the endorsement, the endorsement, which as your honor is correct under Aerojet, the endorsements take precedence over the coverage under Aerojet at page 307 of the record. It says in the event of reduction or exhaustion of the aggregate limits of the underlying insurance by reasons of losses paid under to in the event of exhaustion, continue in force as underlying insurance, not as AIG argues, we pick up from where underlying insurance drops off. It expressly states this continues in force as underlying insurance. And then why doesn't that, why doesn't that language simply speak to when the excess coverage is triggered? Because it says it's continuing as excess, as underlying insurance. It doesn't say- That just means that's when the excess coverage is triggered. Well, that would have been a good thing for the AIG underwriters to put in, but they say it continues as the underlying insurance. Okay. That would have been, you know, your honors have talked about inartful drafting. That's not your honor's fault. That's not the court's fault. That is what AIG did. Now, further, if you take a look at the language that that supplements, and this is set out in our, in our brief at pages 33 and 34, that endorsement takes out language, which clarifies that in what language is being taken out. And the language that's being taken out, and this is said, when you're comparing the language of the record at 300 to the language of the record at 307, the language that's being taken out is the language that says subject to its terms and conditions and limits of liability as stated in items 3a and 3b of the declarations. So what they're removing, if there were three moving is saying, this policy is subject to its own terms and conditions. That language, which appears on 300, is being amended and deleted by AIG, when stating that it's continuing in force as the underlying as the underlying well, but if you're if you're really talking about the scope of the coverage, which seems to me where you are now. I mean, if this expands the scope of the coverage to include claims, then wouldn't it render the coverage and the duty defend the provisions of the base policy, frankly, superfluous? There's perfectly permissible for an excess umbrella policy to supplement coverage in the see that in this policy, through the following form endorsements, where they say we follow form to this, we follow form to that. And in pages, in pages 312, 330, and so on, they follow form, and even they follow form to certain underlying coverages. So it's perfectly consistent coverage, what those coverages have to do with coverage for property damage, resulting from environmental contamination, those No, that's, that's exactly correct, a gentleman with this, but they prove that this policy in incorporates, in certain instances, they follow form and adopt language, they adopt in other places, underlying policy definitions, it's perfectly consistent for a excess umbrella policy to adopt coverages in the in the underlying coverage. I guess I'm just repeating judge Smith's question, but why, if this is a following foreign policy, why would they take such care to define coverage in the way that they do as part of the basic insuring agreement provision, that seems completely unnecessary exercise? Well, following foreign policy? Well, they, they did, they did both, Your Honor, and an umbrella can include broader coverage than the underlying primary, broader or narrower, and it depends on how they define the coverage in the umbrella access policy. Yes, Your Honor. And here, they're saying, they're continuing to enforce as the underlying insurance. Now, one very important point, Your Honor, is the standard here. And obviously, this is no vote for your honors, as a matter of law. But the core question in interpreting this is whether the courts interpretation is a reasonable interpretation, not as whether it's a most reasonable interpretation or the only reasonable interpretation. You just have to have the reasonable interpretation. And AIG argues, well, it's more reasonable to conclude this, or a more reasonable explanation is this. That's not the standard. The standard is... Well, all you're suggesting, all you're suggesting with this argument is that there is not a clear and unambiguous interpretation of this language. And therefore, you can come up with an interpretation that's okay. Now, that's why I asked her the question about what was the language, is it having trouble? I mean, if I find this to be clear and unambiguous, and it is the same as what your opponents suggest the language says, I won't need to talk about your reasonable interpretation at all. It'll be wrong. It's not clear and unambiguously the way you want it to be. Yeah, I've lost your voice. Did you turn off your mic? I can't hear you. Mr. Horkovich, can you hear me? Mr. Horkovich, judge, perhaps if you hold up your hand in the stop sign. Mr. Horkovich, we cannot hear you. Mr. Horkovich. Counselor. Judge, I'll try to give him on the phone. Okay. We can't hear you, counselor. We had him back for just a moment there, Mr. Horgovich. We could hear you. Can you hear me now? Now we can. For approximately the last three minutes, you were... You better go back to your argument you were making because I didn't hear any of it. Thank you, Ronald. May it please the court. The question is whether or not this is a reasonable interpretation. We are not advocating that this language is clear and unambiguous. Far from it. That's not what we're arguing. We're saying that a reasonable interpretation, and this is what the district court found and we asked the court to affirm, that a reasonable interpretation is that when it says that it's continually in force as underlying insurance, that it's providing the same coverage that the underlying insurance provides. AIG does not contest that it provides coverage for claims. And when it deleted the provision that says that it's subject to its terms, conditions, and limits, as stated in the declaration page, and when it says that, it meant that it deleted it and that you relook toward the scope of the coverage, you look toward what's in the underlying policy. And that's consistent with the other aspects of the policy. And that's what the district court held. We ask your honors to affirm that. It's not that we are saying that the language is clear and unambiguous. We're not saying that. We're not saying that we have... Well, we know that. We know that, counselor. We're saying that the only reason we would even think about your reasonable interpretation is if we find it's ambiguous policy. If we don't find it's ambiguous, if we find it's clear and unambiguous, what you think it means makes no difference. That's true. If you find it's clear and unambiguous... Okay. Thank you. Yes, your honor. That's all I was trying to say. If you find that it's clear and unambiguous... Do you want to say something about your second point? I would like to say... About the aggregate limit? If I might just first... Yes, your honor. But I first might say... Because you've only got 225 left. Yes, your honor. I'd like to say something about government. Thank you. And the other case that you cited first. In Garamendi, there was extensive language in that policy. It was different policy language, different factual circumstances. The policyholder, the court in Garamendi held in favor of maximizing coverage. The language was extensive in Garamendi. There were paragraphs and paragraphs in Garamendi that went on that I don't have time to go into, but cited in our briefs at 43-44. Paragraphs after paragraphs that are not in our language. And the court appeal... Counsel, excuse me. Your time is limited. I'd like you to respond. Okay. I have this concern. It'd be helpful for you to know what my concern is. And this is on these aggregate general liability questions. Yes, sir. In the declaration page in item 3B, there's a specific reference to endorsement two. And it begins by saying in the aggregate for the policy period of each annual period, indicating that you look to that endorsement two to determine what that aggregate is. I then find it very difficult to understand how, having been told in the declaration page, you look to endorsement two to determine what that aggregate is, that you then read that language in endorsement two to eliminate any general aggregate liability limitation. I don't know how you can reconcile that argument with what the declaration tells you. The purpose of endorsement two is you look to it to find out what that aggregate is. You say endorsement two eliminates any limit. I don't know how you can make that argument. Well, by looking at page 306, the amendment stated, and the amendments take precedence, of the amendment states that it's declarations each annual period during the currency of this policy, during the currency of this policy, separately in respect to products liability and in respect to personal injury by occupation, disuse, employment, and insurance. As the district court found, there is no express general aggregate. Council said that there is an express general aggregate stated, but there's not an express general aggregate stated. There's an aggregate stated for products and an aggregate stated for occupational disease. There's no general aggregate stated, and that's on page 306 of the record. What I was trying to say about Garamendi, in looking at the blank. Well, but just a minute, your time's up. I think we know what your argument is about Garamendi. We've heard it before. We've read about it. And if you've answered my colleague's question, then I think your time is up. Thank you, your honors, for your time today. Thank you. Could I possibly have one minute for rebuttal? Well, I didn't give him any extra time, really. I'll give you one minute. Then I'll have to give him a minute. You know that. We're the appellant. So typically, you get the rebuttal, the last word. So I'll beg your honor. All right, I'll give you one minute. Thank you very much, your honor. Frankly, that is Judge Rawlinson's normal approach to give you one minute. So I'll give it to you. My approach is when your time's up, it's up. Go ahead. I appreciate it. Thank you very much, your honor. I want to make just two very quick points in response to what Mr. Horkovich said. Your honors have hit the nail on the head when you said, why on earth, if this was intended to be a follow-up policy and to adopt and incorporate the terms of the primary policy, why on earth would this access umbrella policies? Why would they have their own insuring agreement, their own terms and conditions? It renders the entire policy superfluous. And that is contrary to all rules of contract construction. It erases the most fundamental aspect of the policies, which is the insuring agreement. The court's interpretation is not reasonable. The district court's interpretation is not reasonable exactly for this reason. It's not simply any interpretation of which the court is able to conceive. And for these reasons, thank you. Thank you very much. Thank you very much. And we will submit case 1955-409 as been argued and now submitted. Thank you very much, counsel, for your good arguments. We really appreciated it. It's great to have you. And we're sorry we have to do it under these conditions. We hope that the court found it OK because he went on for quite a while. We couldn't hear him. We let him go back and give it to us again. So we appreciate both of you. Thank you very much.
judges: Lipez, Rawlinson, N.R. Smith